IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

**FILED**

**SEP 1 6 2010**

ZENUS SHONE VENTURA,

        Plaintiff,

CV 08-1318-PK (LEAD)

OPINION AND
ORDER

v.


JOHNSON CONTROLS, INC.,

        Defendant.

_____

RUBY McCLAIN,

        Plaintiff,

CV 09-190-PK

v.


JOHNSON CONTROLS, INC.,

        Defendant,

_____

PAPAK, Magistrate Judge:

        Plaintiff Zenus Shone Ventura filed the lead action in these consolidated cases against his

former employer, defendant Johnson Controls, Inc. ("JCI"), on October 1, 2008, in Clackamas

County Circuit Court, alleging JCI's liability for retaliation in violation of O.R.S. 659A.030 and

Page 1 - OPINION AND ORDER

for common law wrongful discharge. JCI removed Ventura's action to this court on November 10, 2008. This court's jurisdiction over Ventura's action is based on the diversity of the parties and the amount in controversy.

Plaintiff Ruby McClain filed the member action in these consolidated cases against defendants JCI (her former employer), Dan Couvillian (her former co-worker at JCI), Tom Kotzian (JCI's human resources manager), Sue Lundin (her former supervisor at JCI), and Andre Wright (her former union steward at JCI) on February 17, 2009, alleging defendants' liability for gender discrimination (hostile work environment) in violation of 42 U.S.C. § 2000e, for retaliation in violation of O.R.S. 659A.030, and for intentional infliction of emotional distress. This court has federal question jurisdiction over McClain's claim arising under Section 2000e, and supplemental jurisdiction over McClain's state-law claims. Ventura's action and McClain's action were consolidated effective May 21, 2009.

Now before the court are JCI's motion (08-1318: #39; 09-190: #36) for summary judgment as to Ventura's claims and defendants' motion (08-1318: #36; 09-190: #33) for summary judgment as to McCain's claims. I have heard oral argument on behalf of the parties, and have considered the motions and all of the pleadings on file. For the following reasons, JCI's motion for summary judgment as to Ventura's claims and defendants' motion for summary judgment as to McClain's claims are each granted.

## LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." Fed. R. Civ. P. 56(c). Summary judgment is not proper if material factual issues

exist for trial. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 318, 322 (1986); *Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir.

1995), *cert. denied,* 116 S.Ct. 1261 (1996). In evaluating a motion for summary judgment, the

district courts of the United States must draw all reasonable inferences in favor of the nonmoving

party, and may neither make credibility determinations nor perform any weighing of the

evidence. *See, e.g., Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554-55 (1990); *Reeves v.

Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000).

## FACTUAL BACKGROUND

JCI is a Wisconsin corporation that owns and operates a plant in Canby, Oregon, where it

manufactures automotive batteries. JCI runs a unionized shop at its Canby plant, and its hourly

employees there are represented by the International Association of Machinists and Aerospace

Workers, District Lodge No. 24, Local Lodge No. 1432 (the "Union"). The terms and conditions

of employment at the Canby plant are governed by a collective bargaining agreement (the

"CBA"). The CBA provides a formal grievance and arbitration procedure for the resolution of

employment disputes.

Independent of the CBA, JCI has promulgated rules governing workplace conduct.

Violations of the "Plant Rules" fall into three categories of severity, designated in increasing

order of severity as "A," "B," and "C" violations. "A" violations trigger a four-step disciplinary

process, in which termination is the fourth and final step, "B" violations trigger a two-step

disciplinary process culminating in termination at the second step, and "C" violations are met

with immediate termination.

Ventura started working at the Canby plant in October 1989, and McClain in 1999. During the first seven years of Ventura's employment at the plant, he received discipline on five occasions for outbursts of yelling and otherwise displaying excessive anger in the workplace. Although Ventura did not receive further discipline for anger-related outbursts in the workplace until 2007, his annual employment evaluations suggest that displays of bad temper and failure to get along well with co-workers remained an issue for him throughout the tenure of his employment in the plant.

Couvillion testifies that he and McClain had a brief romantic affair in 2006. McClain disputes Couvillion's testimony on this point, although she concedes that he once asked her out on a date. It is undisputed that McClain was romantically involved with her co-worker Tau McCoy from July 2006 through November 2006 and then again later during a brief period of April or May 2007.

McClain offers testimony that, at some time in 2006, some of her co-workers began treating her with disrespect and discourtesy in the workplace. She testifies that, during a two week period in 2006, defendants Couvillion and Wright made "comments in the lunchroom like 'females like to use [men] and toss them aside,' 'females are only in it for the money,' and 'females in general like to tease a guy and then turn him away.'" She further asserts that on one occasion in summer 2006, Couvillion threw a clod of baking soda at her face and then bragged about having done so.[1] She further asserts that in November 2006 (during the period of their romantic relationship) McCoy "choked" her by twisting her scarf.

---

[1] It is defendants' position that plant workers frequently threw such soda balls at one another in a spirit of horseplay, and that McClain herself threw them at co-workers from time to time.

Page 4 - OPINION AND ORDER

Later, in February or March 2007, at a time when McClain and McCoy were not romantically involved (although, as noted above, they subsequently renewed their romantic relationship for a brief period a few weeks later), McCoy sent McClain several sexually explicit text messages while both were in the workplace. According to McClain's testimony, in April or May 2007, after McClain and McCoy had resumed their romantic relationship, McCoy took "sexual" pictures of her. McClain testifies that she suspected McCoy showed the pictures to some of her co-workers, but she never acquired evidence to support her suspicions.

According to McClain's testimony, on one occasion in summer 2007, after her romantic relationship with McCoy had definitively ended, when one of McCoy's co-workers was in the plant lunchroom making derogatory comments regarding McCoy's supposed predilection for sex with animals, McCoy saw McClain laughing and mistakenly assumed that she was joining in laughter at McCoy's expense. McClain testifies that McCoy responded by referring to McClain's breasts as udders, and that thereafter he always referred to human breasts as udders when the subject arose in McClain's presence. McClain testifies that in August or September 2007 she heard McCoy, Couvillion, and Wright "in the locker room" talking about McClain's "body parts" and "positions." She further alleges that, beginning in September 2007, one of her co-workers, Jamie Richards, began working less hard when McClain was present in order to make it appear that McClain was slowing production.

It appears that at some time in late summer or early autumn 2007, McClain and Ventura became romantically involved with one another. In November 2007, McClain, Ventura, and some of their co-workers were having breakfast at a Denny's near the Canby plant when they saw Couvillion in his car in the parking lot outside. McClain testifies that she believes he was there

in an effort to observe Ventura and McClain together in order to confirm that the two were

dating, but Couvillion testifies that he was there to pick up medication at a nearby Fred Meyer

pharmacy.

Later in November 2007, defendant Lundin told Ventura that another JCI employee was

unwilling to work with McClain, apparently referring to McClain as Ventura's "cohort."

According to defendants, Ventura was unfamiliar with the word "cohort" and interpreted

Lundin's remark as referring to McClain as his (Ventura's) "co-whore." However, Ventura's

position is that Lundin referred to McClain simply as his "whore" without the "co-." In any

event, the following day Ventura complained about Lundin's remark to JCI human resources,

plant manager Mike Judd, and the Union. JCI management conducted an investigation, but

although Ventura and McClain identified several possible witnesses to the incident, no one

overheard the remark and the investigators were left with each side's uncorroborated

characterization of Lundin's diction. JCI ultimately imposed no discipline on any party, but did

direct that JCI employees were not to use the word "cohort" in the workplace lest further such

misunderstandings ensue. JCI issued reprimands to employees subsequently overheard using the

word "cohort" in the workplace, although it appears that some or all of these reprimands were

grieved to the Union and ultimately repealed.

At that same time, Ventura further complained that McCoy, Couvillion, and Wright were

harassing McClain. JCI investigated that claim as well, but similarly found that no witnesses

were able to corroborate the accusation, and the three employees each denied that they had ever

harassed McClain. JCI issued no discipline in connection with the accusation of harassment.

Plaintiffs concede that Ventura's November 2007 complaint was the first time either

plaintiff brought any of the foregoing allegedly harassing behavior to the attention of JCI management.

Following Ventura's November 2007 complaint, McClain testifies, McCoy and Couvillion began kicking the break room door open rather than opening it with their hands when they knew McClain was in the room (although it is defendants' position that kicking open the break room door was routine and not directed at McClain, but rather a consequence of plant employees' desire not to spread toxic chemicals by touching the door handle with their hands). McClain further asserts that McCoy and Couvillion began at this time frequently making snide remarks to her, and staring at her reflection in the break room window.

On December 6, 2007, McClain and Ventura complained to plant manager Mike Judd that Richards had left early on the previous day, and had refused to work on the "piling table." McClain and Ventura also complained that Couvillion, Richards, and Lundin were "talking and looking" at McClain and Ventura. Judd told McClain and Ventura that Couvillion and Richards had made the same complaint about Ventura and McClain, and said that because it was a "we said/they said" situation he could do nothing about it at that time.

On December 16, 2007, Ventura was working at his work station when, according to Ventura, his co-worker Richards approached the workstation and twice leaned into him. According to Richards, who stated that he had gone to the workstation to approach a third co-worker, also working there, Ventura responded with shouted profanity and belligerence. Ventura went to Lundin and asked her to come out to the work space and to bring supervisor Joe Meyers with her. When Lundin told Ventura that Myers was not on duty, he asked her to bring the other supervisor on duty. When Lundin told Ventura that no other supervisor was on duty, Ventura

said that he was in a "hostile work environment" and needed a third person to be present. Lundin called security and asked for an officer to be present during her discussion with Ventura. Ventura then indicated he would not say anything further until the morning, when another supervisor would be present.

Less than an hour later, Richards approached Lundin to report the same incident. Accoding to Lundin, Richards was visibly upset. Lundin contacted Wright, Ventura's union steward, and the two of them interviewed Davis, who had witnessed the incident in its entirety. Davis' testimony indicated that Ventura had caused the incident, shouting profanity and expressing hostility in an otherwise calm situation. Lundin and Wright therefore went to find Ventura to speak with him further, and found him as he was about to enter the lunchroom. Lundin asked to speak with Ventura but he ignored her and walked past her into the lunchroom. Lundin and Wright followed him into the lunchroom, and Lundin asked to speak with him in her office. Ventura responded by shouting that he didn't need to speak to Lundin or to Wright, but rather only to Judd. Apparently Ventura shouted at Lundin and Wright for approximately five minutes in the lunchroom, in the presence of numerous JCI employees, ignoring Lundin's and Wright's repeated requests that he stop shouting and accompany them to Lundin's office. Lundin eventually told Ventura that he needed to leave the plant, and instructed him to return at 8:00 a.m. the following morning. Ventura apparently continued shouting and expressing hostility for some time before finally leaving the lunchroom. Lundin then contacted security and requested that Ventura be escorted from the building.

Ventura called in sick rather than report in the following morning. Pam Thebault, a JCI supervisor, called Ventura and instructed him not to report to work until the next following day.

Page 8 - OPINION AND ORDER

Thebault then interviewed the employees who had witnessed Ventura's outbursts in the workstation and lunchroom. That same day, Judd conducted an independent investigation of the events of December 16. All witnesses to the workstation incident agreed that Richards had done nothing to provoke Ventura and had not come into physical contact with him. Witnesses to the lunchroom incident indicated that Ventura had been shouting at the top of his lungs, and that the situation had made them uncomfortable. On December 18, 2007, Judd interviewed Ventura with union personnel and JCI management present. At that interview, Ventura admitted to raising his voice and admitted to having ignored Lundin's repeated instructions. Following the interview, Judd made the decision to terminate Ventura's employment, on the ground that he had committed multiple "C" violations of the Plant Rules and behaved in a hostile and threatening manner. Ventura grieved his termination.

McClain asserts that shortly after Ventura's termination Andrew Davis, one of her co-workers who had been present during the workstation incident, walked toward her with his chest thrown out belligerently. She further asserts that in January 2008 McCoy said "nanny nanny boo boo" to her after she dropped something.

On January 7, 2008, the Union met with JCI management to discuss Ventura's grievance. The Union lobbied for Ventura's reinstatement on a "last chance" basis. JCI declined to do so, and the Union advised JCI that it would proceed with arbitration of Ventura's grievance.

At some time during the week of January 22, 2008, McClain contacted JCI's Regional Human Resources manager Gayle Dixon to complain that Ventura's termination had been unfair and that she was being harassed by co-workers and supervisors. Dixon flew out to JCI's Canby location the following week to investigate. McClain told Dixon that McCoy and Couvillion had

Page 9 - OPINION AND ORDER

been leaving her alone since December 2007, but that she was worried that they would start

bothering her again.  Dixon interviewed numerous Canby employees, and concluded on the basis

of these interviews that there was a "high degree of volatility" among the employees working

with McClain, and that McClain was at the center of the issues, apparently due to the dating

relationships she had had with several of her co-workers.  Dixon apparently learned that some

employees had requested transfer off McClain's shift in order to "get away from the drama."

Toward the end of Dixon's investigation, McClain told Dixon about the sexual text

messages she had received from McCoy in early 2007.  This was the first time McClain had ever

brought the text messages to the attention of JCI management.  After JCI determined that McCoy

had sent the text messages while in the workplace, it immediately terminated his employment.

McClain was demoted from her position as "group leader" in February 2008.  McClain

testifies that, at the time the demotion occurred, she was advised that there was "no reason" for

the demotion and that it had been effected "per contract."  There is no indication in the record

before the court that the demotion involved any loss of pay, but it appears likely that the

demotion entailed a reduction in McClain's status and/or prestige.

In or around February or March 2008, McClain grieved the fact that she was being

required to rotate jobs during her shift, the fact that Lundin had not been disciplined for

transposing two numbers on paperwork she had prepared, and the fact that there was offensive

graffiti on a men's bathroom stall wall.

On April 5, 2008, an arbitration was conducted in connection with Ventura's grievance of

his termination.  Ventura did not claim at the arbitration that his termination had been motivated

by retaliatory purpose.  The arbitrator determined that JCI had "just cause" for terminating

Ventura.  On May 7, 2008, Ventura filed BOLI and EEOC charges of discrimination in connection with his discharge.  In his BOLI and EEOC complaints, Ventura alleged that his termination had been due to his actions in opposing sexual harassment, and also alleged that he had been discriminated against on the basis of gender.

Also in May 2008, Dixon returned to Canby to investigate McClain's grievances.  JCI management apparently informed Dixon that McClain had been removed from her group leader position because of bad communication with her supervisor, bad relationships with her co-workers, inability to accept direction from management, and poor management skills.  Dixon apparently also learned that the job rotation requirement McClain had complained of was due to the number of new employees on McClain's shift, and that it had been implemented in order to train these employees in a range of tasks.  The requirement had been imposed on all four employees on McClain's shift.  She also learned that Lundin's error had been corrected and that it was not standard practice to issue discipline for such errors.  Finally, in response to the complaint about the bathroom graffiti, JCI had the bathroom stalls painted, and when the offending graffiti returned, ultimately had the bathroom stall walls removed, and eventually replaced with writing-resistant walls.  JCI continued to monitor security tapes in an effort to prevent the graffiti from returning.

In July 2008 BOLI issued a right to sue letter to Ventura in connection with his charges of discrimination.

McClain went on medical leave for much of the time between May 2008 and November 2008, apparently for medical reasons related to stress.  During that time, JCI assigned Doug Olsen to replace Lundin as McClain's supervisor.  In November 2008, McClain resigned from her

Page 11 - OPINION AND ORDER

employment at JCI.

In September 2008, Ventura filed for bankruptcy in the Western District of Washington. On his bankruptcy petition, Ventura listed among his assets legal claims related to his termination, but failed to list JCI as the defendant in those claims (it appears that he listed only the Union and "WAMU" as potential defendants). The bankruptcy court discharged Ventura of his debts in December 2008, after the lead action in this consolidated case had been filed. Ventura first disclosed this action to the bankruptcy court in December 2009 (after counsel for JCI challenged his failure to disclose the claim during the previous bankruptcy proceedings), whereupon the bankruptcy court granted the trustee's motion to reopen the bankruptcy case in order to permit the trustee to administer and distribute the "asset" that this claim represents. The bankruptcy trustee now informally seeks to be named as the real party in interest in Ventura's action, although no formal motion has been filed to effect the substitution.

## ANALYSIS

### I.    Ventura's Claims against JCI

Ventura's claims against JCI are for retaliation in violation of O.R.S. 659A.030 and for common law wrongful discharge. JCI argues that, in consequence of Ventura's bankruptcy, he is not the real party in interest with standing to bring his claims, that, in consequence of his failure to disclose his claims against JCI to the bankruptcy court he is judicially estopped from bringing this action in his own behalf, and that, under the circumstances of the case, the trustee of Ventura's bankruptcy estate should not be permitted to substitute in for Ventura as plaintiff in this action. In the alternative, JCI argues that Ventura's claims fail on their merits as a matter of law.

A.    **Judicial Estoppel, Real Party in Interest, and Substitution of Bankruptcy Trustee**

Judicial estoppel is an equitable doctrine that precludes a party from gaining an advantage by asserting one position, and then later seeking an advantage by taking a clearly inconsistent position. . . . This court invokes judicial estoppel not only to prevent a party from gaining an advantage by taking inconsistent positions, but also because of general considerations of the orderly administration of justice and regard for the dignity of judicial proceedings, and to protect against a litigant playing fast and loose with the courts.

*Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 782 (9th Cir. 2001) (citations, internal

quotation marks omitted).  Judicial estoppel is applicable both when a party takes inconsistent

positions within a single litigation and when a party takes inconsistent positions in two separate

legal actions.  *See id.* at 783.  The Ninth Circuit "has restricted the application of judicial

estoppel to cases where the court relied on, or 'accepted,' the party's previous inconsistent

position."  *Id.*, citing *Interstate Fire & Casualty Co. v. Underwriters at Lloyd's, London*, 139

F.3d 1234, 1239 (9th Cir. 1998); *Masayesva v. Hale*, 118 F.3d 1371, 1382 (9th Cir. 1997).

Several factors typically inform the decision whether to apply the doctrine in a particular case:  First, a party's later position must be "clearly inconsistent" with its earlier position.  *United States v. Hook*, 195 F.3d 299, 306 (C. A. 7 1999); *In re Coastal Plains, Inc.*, 179 F.3d 197, 206 (C. A. 5 1999); *Hossaini v. Western Mo. Medical Center*, 140 F.3d 1140, 1143 (C. A. 8 1998); *Maharaj v. Bankamerica Corp.*, 128 F.3d 94, 98 (C. A. 2 1997).  Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create "the perception that either the first or the second court was misled," *Edwards v. Aetna Life Ins. Co.*, 690 F.2d 595 at 599.  Absent success in a prior proceeding, a party's later inconsistent position introduces no "risk of inconsistent court determinations," *United States v. C.I.T. Constr. Inc.*, 944 F.2d 253, 259 (C. A. 5 1991), and thus no threat to judicial integrity.  *See Hook*, 195 F.3d at 306; *Maharaj*, 128 F.3d at 98; *Konstantinidis v. Chen*, 200 U.S. App. D.C. 69, 626 F.2d 933, 939.  A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.  *See Davis v. Wakelee*, 156 U.S. 680 at 689, 39 L. Ed. 578, 15 S. Ct. 555; *Philadelphia, W., & B.R. Co. v. Howard*, 54 U.S. 307, 13 HOW 307, 335-337, 14 L. Ed. 157 (1851); *Scarano v. Central R.*

*Co.*, 203 F.2d 510 at 513 (judicial estoppel forbids use of intentional self-contradiction … as a means of obtaining unfair advantage"); *see also* 18 Wright § 4477, p. 782. In enumerating these factors, we do not establish inflexible prerequisites or an exhaustive formula for determining the applicability of judicial estoppel. Additional considerations may inform the doctrine's application in specific factual contexts.

*New Hampshire v. Maine*, 532 U.S. 742, 750-751 (2001).

> In the bankruptcy context, a party is judicially estopped from asserting a cause of action not raised in a reorganization plan or otherwise mentioned in the debtor's schedules or disclosure statements. *Hay v. First Interstate Bank of Kalispell, N. A.*, 978 F.2d 555, 557 (9th Cir. 1992) (failure to give notice of a potential cause of action in bankruptcy schedules and Disclosure Statements estops the debtor from prosecuting that cause of action); *In re Coastal Plains*, 179 F.3d 197, 208 (5th Cir. 1999), *cert. denied*, 528 U.S. 1117, 145 L. Ed. 2d 814, 120 S. Ct. 936 (2000) (holding that a debtor is barred from bringing claims not disclosed in its bankruptcy schedules); *Payless Wholesale Distributors, Inc. v. Alberto Culver (P. R.) Inc.*, 989 F.2d 570, 572 (1st Cir.), *cert. denied*, 510 U.S. 931, 126 L. Ed. 2d 309, 114 S. Ct. 344 (1993) (debtor who obtained relief on the representation that no claims existed cannot resurrect such claims and obtain relief on the opposite basis); *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 419 (3rd Cir.), *cert. denied*, 488 U.S. 967, 102 L. Ed. 2d 532, 109 S. Ct. 495 (1988) (debtor's failure to list potential claims against a creditor "worked in opposition to preservation of the integrity of the system which the doctrine of judicial estoppel seeks to protect," and debtor is estopped by reason of such failure to disclose).

*Hamilton*, 270 F.3d at 783; *see also id.* at 784 ("Judicial estoppel will be imposed when the debtor has knowledge of enough facts to know that a potential cause of action exists during the pendency of the bankruptcy, but fails to amend his schedules or disclosure statements to identify the cause of action as a contingent asset") (citations omitted).

In applying the doctrine of judicial estoppel within the bankruptcy context, the Ninth Circuit adopted as its own the rationale articulated by the Fifth Circuit in *In re Coastal Plains*, 179 F.3d 197 (5th Cir. 1999):

> The rationale for decisions invoking judicial estoppel to prevent a party who failed to disclose a claim in bankruptcy proceedings from asserting that claim after emerging from bankruptcy is that *the integrity of the bankruptcy system depends*

Page 14 - OPINION AND ORDER

*on full and honest disclosure by debtors of all of their assets.* The courts will not permit a debtor to obtain relief from the bankruptcy court by representing that no claims exist and then subsequently to assert those claims for his own benefit in a separate proceeding. *The interests of both the creditors, who plan their actions in the bankruptcy proceeding on the basis of information supplied in the disclosure statements and the bankruptcy court, which must decide whether to approve the plan of reorganization on the same basis, are impaired when the disclosure provided by the debtor is incomplete.*

*Id.* at 785 (modifications omitted; emphasis original), *quoting In re Coastal Plains*, 179 F.3d at 208, *quoting Rosenshein v. Kleban*, 918 F. Supp. 98, 104 (S.D.N.Y. 1996).

However, the Ninth Circuit Bankruptcy Appellate Panel has clarified that a debtor's position taken in post-petition litigation cannot ordinarily bind the *trustee* of the debtor's estate, even if that position is inconsistent with a position taken in the debtor's bankruptcy petition:

As it is fundamental that the interests of the debtor and the trustee can be adverse, it is likewise fundamental that they are entitled to take inconsistent positions. When they do so independently in parallel litigation, a judgment achieved by one of them does not, under standard rules of claim and issue preclusion, bind the other. . . .

It follows that a position taken by a trustee in litigation that is inconsistent with an earlier position taken by the debtor in litigation to which the trustee is not party, normally is not an inconsistency that warrants imposition of judicial estoppel. In other words, it would be extraordinary for the trustee in the garden-variety bankruptcy to be estopped on account of something the debtor did for its own account during the case.

*Cheng v. K&S Diversified Invs., Inc. (In re Cheng)*, 308 B.R. 448, 454-455 (B.A.P. 9th Cir. 2004); *see also id.* at 457, n. 4 ("(1) a debtor may be judicially estopped on account of an earlier inconsistent position taken as debtor; (2) a trustee may be judicially estopped on account of an earlier inconsistent position taken as trustee; (3) a trustee ordinarily may not be judicially estopped on account of an earlier inconsistent position taken by the debtor").

Moreover, Federal Civil Procedure Rule 17(a)(3) provides that "[t]he court may not

dismiss an action for failure to prosecute in the name of the real party in interest until, after an

objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be

substituted into the action. After ratification, joinder, or substitution, the action proceeds as if it

had been originally commenced by the real party in interest."

Here, it is undisputed that Ventura filed his action against JCI on October 1, 2008, very

shortly after filing for bankruptcy in September 2008, and that he made no effort to advise the

bankruptcy court of the claims against JCI until December 2009, a full year after the bankruptcy

proceedings had been resolved in Ventura's favor, after JCI's counsel challenged his failure to do

so earlier. Under *Hamilton* and other applicable case law, Ventura is therefore estopped from

proceeding against JCI in his own behalf. However, under Rule 17(a)(3), the bankruptcy trustee

must be given an opportunity to be substituted into the action before the action can be dismissed

for lack of standing, and Ventura's bankruptcy trustee has expressed his intention to pursue

Ventura's claims on behalf of the estate.[2] In the event Ventura's claims could survive summary

---

[2] JCI cites *Dunmore v. United States*, 358 F.3d 1107 (9th Cir. 2004), *Turner v. Cook*, 362 F.3d 1219 (9th Cir. 2004), and *Wenger v. Johnson Controls Battery Group, Inc.*, Case No. 04-CV-1714-BR, 2006 U.S. Dist. LEXIS 6816 (D. Or. Feb. 1, 2006), for the proposition that, where a debtor files an action in his or her own name despite the fact that his or her claim properly belongs to a bankruptcy estate, the bankruptcy trustee may only be substituted as the real party in interest where (i) the trustee has expressly abandoned the claim and (ii) the debtor made an "understandable mistake" by filing in his or her own name. On this basis, JCI argues that the Ventura's trustee may not be substituted as the real party in interest, because the trustee has not abandoned the claim and because Ventura's decision to pursue his claims against JCI in his own name was not an understandable mistake. However, *Dunmore* properly stands for the proposition that, following abandonment of a claim by the trustee/estate, a debtor may pursue a claim *in his or her own name* with ratification by the trustee, and that the trustee's after-the-fact ratification will relate back to the debtor's filing to file in his own name was an understandable mistake. *See Dunmore*, 358 F.3d at 1112-1113. Similarly, *Turner* properly stands for the proposition that, absent abandonment by the trustee, a debtor may not pursue a claim belonging to the estate *in his or her own name*. *See Turner*, 362 F.3d at 1225-1226. While the *Wenger* court did characterize *Dunmore* and *Turner* as standing for the

Page 16 - OPINION AND ORDER

judgment, I would therefore permit Ventura's action against JCI to go forward in the name of the bankruptcy trustee, on behalf of the estate in bankruptcy. Because, however, for reasons set forth below, Ventura's claims fail on their merits as a matter of law, I do not order the trustee's substitution into this action.

### B.    Ventura's Claim for Retaliation Against JCI

Retaliation claims under O.R.S. 659A.030 are analyzed under the same framework as Title VII retaliation claims. *See, e.g., Harris v. Pameco Corp.*, 170 Or. App. 164, 179 (2000); *Pool v. Vanrheen*, 297 F.3d 899, 910 (9th Cir. 2002). In order to establish a *prima facie* case of retaliation under O.R.S. 659A.030, a plaintiff must demonstrate that (1) he engaged in a statutorily protected activity; (2) he was subjected to an adverse employment action; and (3) the plaintiff's statutorily protected activity was a substantial factor in the employer's adverse employment decision. *See Pool*, 297 F.3d at 910; *Seitz v. State ex rel. Albina Human Res. Ctr.*, 100 Or. App. 665, 675 (1990). If the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. *See Manatt v. Bank of Am.*, 339 F.3d 792, 801 (9th Cir. 2003). If the defendant satisfies its burden, the burden shifts back to the plaintiff to establish that the defendant's proffered reason for the adverse employment action was pretextual. *See id.*

Assuming without deciding that Ventura has presented evidence sufficient to support a *prima facie* claim for retaliation, it is undisputed that JCI has presented a significant body of evidence in support of its position that Ventura was terminated in consequence of his workplace

---

proposition here advocated by JCI, I do not find that *Wenger* articulates a persuasive statement of applicable law. I therefore find that substitution of the bankruptcy trustee is governed by Rule 17(a)(3).

outburst and insubordination of December 16, 2007.  In support of his position that JCI's proffered reason is merely pretextual, Ventura points to the temporal proximity of his complaint regarding the alleged harasssment of McClain and his termination, and to the deposition testimony of JCI employee Deedra Thompson.

A plaintiff can prove that a proffered reason is pretextual either "(1) indirectly, by showing that the employer's proffered explanation is 'unworthy of credence' because it is internally inconsistent or otherwise not believable, or (2) directly, by showing that unlawful discrimination more likely motivated the employer." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000).  "Circumstantial evidence of pretext must be specific and substantial in order to survive summary judgment." *Bergene v. Salt River Proj. Agr. Improv. & Power Dist.*, 272 F.3d 1136, 1142 (9th Cir. 2001).

Ventura's reliance on the temporal proximity of his termination and the complaint he made to JCI management is misplaced.  Where such temporal proximity does not refute any element of an employer's proffered reason for an adverse employment action, it is insufficient to permit a plaintiff to meet his burden to create a question of fact as to pretext.  *See Hashimoto v. Dalton*, 118 F.3d 671, 680 (9th Cir. 1997) (although the temporal proximity of an adverse employment action to an employee's protected behavior may suffice to support a "minimal prima facie case of retaliation," where such timing "does nothing to refute the . . . proffered [*sic*] legitimate reasons for" the disciplinary action, evidence of such temporal proximity is insufficient to carry the plaintiff's burden "of establishing a triable issue of fact on the ultimate question" of retaliation").

Thompson offered testimony that McClain's co-workers were motivated to retaliate

against McClain when they treated her with disrespect and discourtesy in the workplace, and that Ventura's co-workers wanted to see Ventura get fired.  However, Thompson's opinion ascribing retaliatory motive to plaintiffs' *co-workers* does nothing to refute any element of JCI's proffered reason for Ventura's termination, nor does it create any question of fact as to JCI's motivation. Ventura's reliance on Thompson's testimony is therefore likewise misplaced, since it is similarly insufficient to permit him to meet his burden to establish that JCI's proffered reason is pretextual. *See Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 890-891 (9th Cir. 1994).

Because Ventura has offered no evidence from which a trier of fact could reasonably conclude that JCI's proffered, nondiscriminatory reasons for his termination were pretextual, his retaliation claim necessarily fails as a matter of law.  JCI is therefore entitled to summary judgment as to Ventura's claim of retaliation.

### C.    Ventura's Claim for Wrongful Discharge Against JCI

The tort of wrongful discharge was established in Oregon "to serve as a narrow exception to the at-will employment doctrine in certain limited circumstances where the courts have determined that the reasons for the discharge are so contrary to public policy that a remedy is necessary in order to deter such conduct." *Draper v. Astoria Sch. Dist. No. 1C*, 995 F. Supp. 1122, 1127 (D. Or. 1998), *citing Walsh v. Consol. Freightways, Inc.*, 278 Or. 347, 351-52, (1977); *Sheets v. Knight*, 308 Or. 220, 230-31, 779 P.2d 1000 (1989).  "The elements of a wrongful discharge claim are simple:  there must be a discharge, and that discharge must be wrongful." *Moustachetti v. Oregon*, 319 Or. 319, 325, 877 P.2d 66 (1994).  Under Oregon law, two circumstances lead to wrongful discharge: "(1) discharge for exercising a job-related right of important public interest, and (2) discharge for complying with a public duty," *Draper*, 995 F.

Page 19 - OPINION AND ORDER

Supp. at 1127, *citing Sheets*, 308 Or. at 230-31).  Examples of "exercising a job-related right"

include, *e.g.*, "filing a workers' compensation claim" and "resisting sexual harassment."  *Id.*

(citations omitted).

      Generally, however, Oregon courts will not "recognize an additional common law remedy

for wrongful discharge . . . if existing remedies adequately protect the employment related right."

*Carlson v. Crater Lake Lumber Co.*, 103 Or. App. 190, 193 (1990).  JCI argues that Ventura's

wrongful discharge claim is effectively preempted by the availability of a statutory remedy for

retaliatory discharge under O.R.S. 659A.030.  In the alternative, JCI argues that the wrongful

discharge claim fails for the same reasons as the retaliation claim.

      Ventura, for his part, concedes that his wrongful discharge claim seeks to remedy the

same alleged violation of his rights as an employee as does his retaliation claim.  However, he

argues that, in the event his retaliation claim is not permitted to go forward, O.R.S. 659A.030

cannot preempt the common-law wrongful discharge claim.

      Ventura's argument is unpersuasive.  Either his termination was wrongful for being in

consequence of Ventura's exercise of an employment right, in which case he would have a viable

claim for retaliation and his wrongful discharge claim would be preempted, or his termination

was not wrongful, in which case he would not have a viable wrongful discharge claim.  A claim

for wrongful discharge does not lie where a plaintiff has a *defective* claim under an existing

statutory remedy, but rather where *no* remedy would otherwise exist.  *See Carlson*, 103 Or. App.

at 193.  Because Oregon law provides a clear remedy for the violation of Ventura's rights alleged

in his complaint, namely, O.R.S. 659A.030, his claim for wrongful discharge necessarily fails as

a matter of law.  JCI is therefore entitled to summary judgment as to Ventura's claim for

Page 20 - OPINION AND ORDER

wrongful discharge.

## II.    McClain's Claims Against All Defendants

McClain's claims against the defendants are for gender discrimination (hostile work environment) in violation of 42 U.S.C. § 2000e, for retaliation in violation of O.R.S. 659A.030, and for common-law intentional infliction of emotional distress.  Defendants argue that the Title VII gender discrimination claim fails as a matter of law as to each individual defendant because Title VII damages are available only against employers and as to JCI because McClain cannot show that the alleged harassing conduct she was subjected to was unwelcome or occurred because of her gender, and because JCI took immediate and effective action to halt the alleged harassment of McClain by her co-workers once the harassment was reported to JCI management. Defendants further argue that McClain's retaliation claim fails as a matter of law because McClain cannot show that she suffered an adverse employment action that was motivated in substantial part to retaliate against McClain for engaging in any protected activity.  Finally, defendants argue that McClain's intentional infliction of emotional distress claim fails as a matter of law because no defendant subjected McClain to treatment outside the bounds of decency.

### A.    McClain's Gender Discrimination / Hostile Work Environment Claim Against All Defendants

To prevail on a hostile work environment claim premised on gender, a plaintiff must show: "(1) that [s]he was subjected to verbal or physical conduct of a . . . sexual nature; (2) that the conduct was unwelcome; and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive work environment." *Vasquez v. County of Los Angeles*, 349 F.3d 634, 642 (9th Cir. 2003).  The plaintiff is required to prove that the unwelcome conduct occurred because of her gender. *See Nichols v. Azteca Rest. Enters.*,

Page 21 - OPINION AND ORDER

256 F.3d 864, 872 (9th Cir. 2001), *citing Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998).

To determine whether an environment is sufficiently hostile or abusive to violate Title VII, the courts of the Ninth Circuit look at "all the circumstances," including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.*, *quoting Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). "The required level of severity or seriousness 'varies inversely with the pervasiveness or frequency of the conduct.'" *Id.*, *quoting Ellison v. Brady*, 924 F.2d 872, 878 (9th Cir. 1991). "Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998); *see also Manatt v. Bank of Am.*, 339 F.3d 792, 799 (9th Cir. 2003) (co-workers' racist jokes and a few occasions of racially insensitive humor directed at the plaintiff were insufficient to establish a hostile environment); *Kortan v. Cal. Youth Auth.*, 217 F.3d 1104, 1111 (9th Cir. 2000) (finding no hostile work environment where the supervisor referred to females as "castrating bitches," "Madonnas," or "Regina" in front of plaintiff on several occasions). The objective severity of the conduct is analyzed from the perspective of a reasonable person under all of the relevant circumstances. *See Nichols*, 256 F.3d at 872, *citing Oncale*, 523 U.S. at 81-82.

Only employers, and not individual employees of an employer defendant, may be held liable for violations of Title VII. *See* 42 U.S.C. § 2000e(b); *see also Miller v. Maxwell's Int'l*, 991 F.2d 583, 588 (9th Cir. 1993). McClain concedes that she may not seek damages against the

individual defendants in connection with her Title VII claim. Defendants are therefore entitled to summary judgment as to McClain's Section 2000e claim to the extent alleged against defendants Couvillian, Kotzian, Lundin, and Wright.

To the extent the Section 2000e claim is alleged against defendant JCI, assuming without deciding that at least some of the conduct was "sufficiently severe or pervasive" to create a hostile work environment (although it appears quite unlikely that the conduct taking place prior to McCoy's termination could have been sufficiently severe or pervasive), the first determination I am called upon to make is whether McClain has established that the conduct was unwelcome. JCI argues that the fact that McClain either did not report or delayed before reporting much of the conduct, as well as the fact of her romantic relationship with McCoy, who was responsible for much of the most objectively offensive conduct, establishes as a matter of law that McClain did not find the conduct subjectively unwelcome. JCI's argument is implausible on its face and unpersuasive on its merits. McClain has offered evidence into the record that the complained-of conduct frequently caused her to cry in the workplace and ultimately contributed to her decision to go on stress-related medical leave from her employment at JCI. At a minimum, McClain's evidence is sufficient to create a question of fact as to whether the harassment was subjectively unwelcome.

By contrast, I am unpersuaded by McClain's argument that the complained-of conduct occurred because of her gender. McClain expressly concedes that much of the conduct she characterizes as harassing was motivated by a desire to retaliate against her for the role she played in procuring McCoy's termination and/or for the failure of her relationship with McCoy, but argues that had she not been female, she would not have had an unsuccessful romantic

relationship with McCoy in the first instance, and the events that precipitated McCoy's termination would not have occurred.  One problem with McClain's argument is that it fails to account for the fact that some of the conduct was apparently directed at Ventura as well, or that some of the conduct directed exclusively at McClain had no clear relationship to her gender.  More critically, to the extent McClain relies upon her relationship with McCoy to support her theory that the alleged harassment was gender-related, it is clear that the operative factor was the existence of the relationship, and not McClain's gender.  On McClain's theory of but-for causation, a female employee harassed by a male heterosexual co-worker with whom she had a sexual relationship would have a Title VII claim, whereas a female employee subjected to identical harassment by a male bisexual co-worker with whom she had a sexual relationship would not, because under those circumstances it would not be possible to say that the relationship would not have occurred but for the harassment victim's gender.  I am unaware of any support for the theory that Congress may have intended in enacting Section 2000e to render harassment by a heterosexual co-worker actionable but to exempt harassment by a bisexual co-worker from liability.

Moreover, the courts of the Ninth Circuit do not impose liability on employers for harassment perpetrated by a claimant's co-workers unless the employer "knew, or in the exercise of reasonable care should have known" about the hostile or offensive work environment and failed to remedy the situation.  *EEOC v. Hacienda Hotel*, 881 F.2d 1504, 1516 (9th Cir. 1989).  Where an employer takes immediate and appropriate corrective action upon learning about alleged harassment, no liability may attach to the employer.  *See id.* at 1515-1516; *see also* 29 C.F.R. § 1604.11(d).  Here, it is undisputed that JCI immediately investigated every complaint it

received from McClain or Ventura, took effective steps to remedy each complaint for which investigation uncovered even partial support, including immediately terminating McCoy upon learning that he sent sexually explicit text messages to McClain while in the workplace, forbidding the use of the inoffensive term "cohort" lest its use offend the plaintiffs, and removing men's room bathroom stalls on which offensive graffiti appeared. Although JCI imposed no discipline in connection with some of McClain's and Ventura's complaints, it did so only where witnesses named by McClain and/or Ventura failed to corroborate the complaints, in which case stern corrective action would have been clearly inappropriate. JCI's prompt and reasonable corrective measures therefore shield them from direct liability under Section 2000e. *See Hacienda Hotel*, 881 F.2d at 1515-1516, 29 C.F.R. § 1604.11(d).[3] Defendants are therefore entitled to summary judgment as to McClain's Section 2000e claim to the extent alleged against defendant JCI.

**B.      McClain's Retaliation Claim Against All Defendants**

Retaliation claims under O.R.S. 659A.030 are analyzed under the same framework as Title VII retaliation claims. *See, e.g., Harris v. Pameco Corp.*, 170 Or. App. 164, 179 (2000); *Pool v. Vanrheen*, 297 F.3d 899, 910 (9th Cir. 2002). In order to establish a *prima facie* case of retaliation under O.R.S. 659A.030, a plaintiff must demonstrate that (1) she engaged in a statutorily protected activity; (2) she was subjected to an adverse employment action; and (3) the

---

[3] McClain does not argue that JCI could be vicariously liable under Section 2000e for the allegedly harassing conduct of her co-workers, nor does the evidence in the record support the theory that the alleged harassment could have taken place within the scope of the co-workers' employment, in that there is no evidence that the co-workers were motivated by a desire to serve their employer when they undertook to harass McClain. *See Chesterman v. Barmon*, 305 Or. 439, 442 (1988).

Page 25 - OPINION AND ORDER

plaintiff's statutorily protected activity was a substantial factor in the employer's adverse employment decision. *See Pool*, 297 F.3d at 910; *Seitz v. State ex rel. Albina Human Res. Ctr.*, 100 Or. App. 665, 675 (1990). If the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. *See Manatt v. Bank of Am.*, 339 F.3d 792, 801 (9th Cir. 2003).

The evidence in the record establishes that at most two events could constitute adverse employment actions directed at McClain: her own resignation from employment with JCI, on a theory of constructive discharge, and her nominal demotion from her group leader position.[4]

Under Oregon law, constructive discharge occurs where:

(1) the employer intentionally created or intentionally maintained specified working conditions; (2) those working conditions were so intolerable that a reasonable person in the employee's position would have resigned because of them; (3) the employer desired to cause the employee to leave employment as a result of those working conditions or knew that the employee was certain, or substantially certain, to leave employment as a result of those working conditions; and (4) the employee did leave the employment as a result of those working conditions.

*McGanty v. Staudenraus*, 321 Or. 532, 557-558 (1995) (footnotes omitted). Here, it is clear that McClain did not leave her employment at JCI as a result of the co-worker harassment that McClain argues could have constituted intolerable working conditions, because that harassment was not ongoing at the time she tendered her resignation. Moreover, no trier of fact could reasonably conclude on the basis of evidence in the record that JCI intentionally maintained working conditions in which McClain would be subjected to co-worker harassment, because JCI

---

[4] "Because an employer cannot force employees to socialize with one another, ostracism suffered at the hands of coworkers cannot constitute an adverse employment action." *Brooks v. City of San Mateo*, 214 F.3d 1082, 1093 (9th Cir. 2000).

took effective steps to prevent the harassment whenever it was able through reasonable efforts to ascertain that arguably harassing behavior had occurred. McClain therefore has not met her burden to establish a question of fact as to whether her resignation could have been a result of constructive discharge. Her resignation therefore cannot serve as the basis for her retaliation claim.

Similarly, there is no evidence in the record from which a trier of fact could reasonably conclude that McClain's demotion was an actionable adverse employment action. The Ninth Circuit has held that "only non-trivial employment actions that would deter reasonable employees from complaining about Title VII violations will constitute actionable retaliation." *Brooks v. City of San Mateo*, 214 F.3d 1082, 1092-1093 (9th Cir. 2000).

> Among those employment decisions that can constitute an adverse employment action are termination, dissemination of a negative employment reference, issuance of an undeserved negative performance review and refusal to consider for promotion. By contrast, we have held that declining to hold a job open for an employee, badmouthing an employee outside the job reference context and transferring an employee where salary is unaffected do not constitute adverse employment actions.

*Id.* at 1093 (footnotes omitted); *see also, e.g., Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 919 (9th Cir. 1996) (no actionable adverse employment action where employee was transferred to a new position without reduction in compensation). The *Brooks* court cited with approval decisions of the Sixth Circuit that no actionable adverse employment action occurred where a plaintiff was demoted but "continued to receive the same salary and benefits," *id.*, n. 9, *quoting Yates v. Avco Corp.*, 819 F.2d 630, 638 (6th Cir. 1987), and of the Eighth Circuit that "evidence that plaintiff 'suffered a loss of status and prestige with the reassignment of her staff' [was] insufficient to state claim for adverse employment action under Title VII," *id.*, n. 9, *quoting*

Page 27 - OPINION AND ORDER

*Ledergerber v. Stangler*, 122 F.3d 1142, 1144 (8th Cir. 1997). Here, there is no evidence in the record suggesting that McClain's demotion involved any reduction in pay or benefits, or that the demotion was of a non-trivial kind "that would deter reasonable employees from complaining about Title VII violations."

Because McClain has not met her burden to establish that she suffered any adverse employment action, her retaliation claim necessarily fails as a matter of law. Defendants are therefore entitled to summary judgment as to McClain's 659A.030 retaliation claim.

## C.   McClain's Intentional Infliction of Emotional Distress Claim Against All Defendants

Under Oregon law, to prevail on a claim for intentional infliction of emotional distress a plaintiff must prove that "(1) the defendant intended to inflict severe emotional distress on the plaintiff, (2) the defendant's acts were the cause of the plaintiff's severe emotional distress, and (3) the defendant's acts constituted an extraordinary transgression of the bounds of socially tolerable conduct." *McGanty*, 321 Or. at 543, *quoting Sheets*, 308 Or. at 236. A defendant acts with intention to cause emotional distress when the defendant intends an action that the defendant knows is substantially certain to cause emotional distress. *See id.*, at 551.

The Oregon courts have held that the trial court must play a "gatekeeper role in evaluating the viability of an [intentional infliction of emotional distress] claim by assessing the allegedly tortious conduct to determine whether it goes beyond the farthest reaches of socially tolerable behavior and creates a jury question on liability." *House v. Hicks*, 218 Or. App. 348, 358 (Or. Ct. App. 2008), *citing Tenold v. Weyerhaeuser Co.*, 127 Or. App. 511, 517 (1994); *Pakos v. Clark*, 253 Or. 113 (1969). The *House* court opined that "[w]hether conduct is an extraordinary transgression is a fact-specific inquiry, to be considered on a case-by-case basis, based on the

Page 28 - OPINION AND ORDER

totality of the circumstances. [The courts must] consider whether the offensiveness of the conduct exceeds any reasonable limit of social toleration, which is a judgment of social standards rather than of specific occurrences." *Id.* at 358-359 (internal quotation marks and modifications omitted), *quoting Hall v. The May Dep't. Stores*, 292 Or. 131, 137 (1981).

The most important of the contextual factors the courts must consider in evaluating whether alleged conduct may support a viable claim for intentional infliction of emotional distress is whether the parties are in a "special relationship . . . , such as an employer-employee, physician-patient, counselor-client, landlord-tenant, debtor-creditor or government officer-citizen [relationship], that shapes the interpersonal dynamics of the parties." *Id.* at 360. "A defendant's relationship to the plaintiff may be one that 'imposes on the defendant a greater obligation to refrain from subjecting the victim to abuse, fright, or shock than would be true in arm's-length encounters among strangers.'" *Id.*, *quoting McGanty*, 321 Or. at 547-48. The courts also consider whether the complained-of conduct was illegal or criminal, whether the conduct was undertaken with an "ulterior motive," whether the conduct was intended to "take advantage of an unusually vulnerable individual," and the setting in which the conduct occurred. *Id.* at 359, 360 (citations omitted).

Here, although JCI was at all material times in an employer-employee relationship with McClain, imposing on JCI an arguably greater-than-normal obligation to refrain from subjecting McClain to abuse, McClain does not argue that JCI's actions were the direct cause of any emotional distress she suffered. Moreover, McClain concedes that JCI's alleged failure to shield McClain from co-worker harassment is not sufficiently outrageous to subject JCI to direct liability for intentional infliction of emotional distress. Instead, McClain argues only that the

Page 29 - OPINION AND ORDER

individual defendants may be liable for intentional infliction of emotional distress, and that JCI

may be vicariously liable for the emotional distress intentionally inflicted by its employees.

McClain was subjected to at least some conduct that arguably could be construed as

"go[ing] beyond the farthest reaches of socially tolerable behavior," namely, the conduct

perpetrated by Tau McCoy, McClain's one-time romantic interest, when he sent McClain

sexually explicit text messages in the workplace.  Because McCoy is not a defendant in this

action, McCoy's conduct is relevant only to McClain's theory of JCI's vicarious liability.

> According to Oregon law:
>
> Under the doctrine of *respondeat superior*, an employer is liable for an employee's
> torts when the employee acts within the scope of employment.  Negligence or
> other tortious conduct by the employer is not required.  . . .
>
> Three requirements must be met to conclude that an employee was acting within
> the scope of employment.  These requirements traditionally have been stated as:
> (1) whether the act occurred substantially within the time and space limits
> authorized by the employment; (2) whether the employee was motivated, at least
> partially, by a purpose to serve the employer; and (3) whether the act is of a kind
> which the employee was hired to perform.

*Chesterman v. Barmon*, 305 Or. 439, 442 (1988) (citations omitted).  McClain has offered no

evidence to suggest either that McCoy was motivated in any degree to serve JCI when he sent her

the offensive text messages, nor does any evidence in the record suggest that McCoy's conduct

was in any sense an act he was hired to perform.  McClain therefore has not met her burden to

establish a question of fact as to JCI's potential vicarious liability for McCoy's offensive conduct.

Analysis of the remaining allegedly harassing conduct establishes that none of it can be

construed as constituting an "extraordinary transgression of the bounds of socially tolerable

conduct."  While some of the behavior directed towards McClain was both objectively and

subjectively offensive, including conducting derogatory discussions of women in general in

Page 30 - OPINION AND ORDER

McClain's hearing, striking her with a soda ball, and using threatening body language towards her, even taken collectively such incidents are insufficient to support an intentional infliction claim. Because McClain has not met her burden to show that she was subjected to conduct constituting an extraordinary transgression of the bounds of socially tolerable conduct (other than McCoy's actions, discussed above), her intentional infliction of emotional distress claim necessarily fails. Defendants are therefore entitled to summary judgment as to McClain's IIED claim.

## CONCLUSION

For the reasons set forth above, JCI's motion (08-1318: #39; 09-190: #36) for summary judgment as to Ventura's claims and defendants' motion (08-1318: #36; 09-190: #33) for summary judgment as to McCain's claims are each granted. A final judgment shall be prepared.

Dated this 16th day of September, 2010.

Honorable Paul Papak
United States Magistrate Judge